# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

JOHNNIE M. HAYES,                )        NO. CV 04-07319-SGL
                                 )
            Plaintiff,           )
                                 )
        vs.                      )        ORDER REVERSING AND REMANDING
                                 )        COMMISSIONER'S DECISION DENYING
JO ANNE B. BARNHART,             )        BENEFITS
                                 )
            Defendant.           )
_____)

    Johnnie M. Hayes has suffered from a cardiac condition since
her early childhood.  She was born with a heart murmur and while a
child contracted rheumatic fever which aggravated her heart ailment
by thickening and stiffening her mitral valve (mitral valve
stenosis) preventing blood from flowing from her lungs into her
heart resulting in shortness of breath.  Hayes underwent heart
surgery (possibly to replace her mitral valve) and recovered well.
The rest of her childhood and early adult years were uneventful for
heart problems.

    Then in October, 2001, she began suffering from heart
palpitations and shortness of breath, and was taken to a hospital
emergency room.  Hayes was found to have developed venticular

tachycardia (that is, a rapid heart beat).  In October, 2001, Hayes
had a pacemaker implanted to assist with her heart arrhythmia.  In
January, 2002, she was cleared by her treating physician to return
to work, something which she promptly did on January 2, 2002,
returning as a loan processor for Washington Mutual Bank.  Hayes
left her job after only a few weeks claiming that the stress from
the job was causing her repeated heart problems, sometimes termed as
"heart attacks" and other times referred to as "defibrillator going
off," even though treatment notes from the same time period ascribed
such symptoms to "drug side effect[s]" and not to any problem with
her heart or pacemaker.  (A.R. at 112, 235-244, 277, 286, 289, 313,
314, 326, 329, 330-31).  Hayes' heart condition continued to improve
following the implantation of the pacemaker such that by November,
2002, her ejection fraction ratio had risen from either 20/25% or
30% to close to 40%.  The increase in her ejection fraction ratio
prompted Hayes' treating physician to recommend she undergo surgery
to replace her mitral valve with a mechanical device (although there
is contrary evidence that the only reason why the surgery was not
performed beforehand was Hayes' reluctance).

In December, 2002, Hayes underwent a mitral valve replacement
surgery.  She returned to work as a loan processor a few months
later at U.S. Trust in June, 2003.  (A.R. at 325-26).

Even with her return to the workforce after these multiple
surgeries to correct her heart problems, Hayes asserted that she
continued to suffer from chest pains and generalized fatigue and
weakness.  Hayes complained that these difficulties made her feel
"like I could be about 99 years old."  (A.R. at 332).  Hayes
asserted that the chest pains and fatigue kept her from being able

to "walk up" more than a "couple of stairs" before being overcome with fatigue and weakness, and caused her to suffer from memory problems. (A.R. at 327, 332).

Hayes filed an application for disability benefits on November 19, 2001, alleging that, since November 15, 2001, her heart ailment had rendered her disabled as that term is defined under the Social Security Act. (A.R. at 55). The Commissioner, after an internal agency review and a hearing before an administrative law judge ("ALJ"), denied her application. The Commissioner's decision is contained in the ALJ's decision dated October 27, 2003. In that decision, the ALJ found that, despite her heart ailment, Hayes had the residual functional capacity (RFC) to "lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for four hours, and sit for six hours in an eight-hour workday." (A.R. at 20). With such a RFC the ALJ concluded, and a vocational expert so testified, that Hayes could perform her past work as a mortgage loan processor or clerical assistant. (A.R. at 27, 344). In the course of reaching that decision the ALJ discounted Hayes' subjective complaints, noting that, for a number of reasons, she was a less than credible witness. (A.R. at 26).

Hayes requested review of the ALJ's decision by the Appeals Council, 20 C.F.R. § 416.1467, and submitted new evidence consisting of a letter dated November 17, 2003, from her treating cardiologist, Dr. Mayer Rashtian, in which he noted that a "echocardiogram [performed on Hayes] in January of 2003, showed an ejection fraction of 40%" and assigned Hayes a American Heart Association (AHA) functional capacity class score of between two and three, meaning Hayes suffered from "slight" to "marked" limitation in her physical

activity and that she could only engage in somewhere between ordinary and less than ordinary physical activity before the onset of fatigue, heart palpitations, and chest pain.  (A.R. at 320; Attachment to Joint Stipulation).

On June 18, 2004, the Appeals Council denied Hayes's request for review.  The Appeals Council acknowledged that Social Security Administration regulations provide that where "new and material evidence" is submitted with the request for review, the entire record (including the new evidence) will be evaluated and review granted where the ALJ's "decision is contrary to the weight of all the evidence now in the record."  (A.R. at 5).  Nonetheless, the Appeals Council stated that the additional "information does not provide a basis for changing the [ALJ's] decision."  (A.R. at 5-6).  Accordingly, the Appeals Council noted that the ALJ's decision stood as the "final decision of the Commissioner" in Hayes' case.  (A.R. at 5).

The matter is now before this Court.

The principal argument between the parties is over the Appeals Council's handling of the new evidence from Dr. Rashtian.  According to Hayes, Dr. Rashtian's letter is "inconsistent" with the ALJ's conclusion that Hayes could perform "light or sedentary exertion because those levels of exertion appear to require ordinary (or perhaps even more than ordinary) exertion."  (Joint Stipulation at 10).  Yet the Appeals Council never gave a reason for rejecting Dr. Rashtian's opinion.  It is this absence of reasoning which Hayes asserts constitutes error on the Appeals Council's part.  The Commissioner presses two points in rebuttal: (1) Dr. Rashtian's opinion "was not material to the period covered by the ALJ's

4

decision" as there was no indication that his opinion applied retrospectively to the time under consideration by the ALJ, that is, the period from November 15, 2001 to October 27, 2003; and (2) even if the opinion could be considered to have a retrospective component the doctor's opinion "does not provide a functional assessment" of Hayes' heart condition, but "merely indicates that [Hayes] had a medically determinable impairment," which no one disputes, "and that she was classified between Class II-III congestive heart failure." (Joint Stipulation at 12).  Neither of the Commissioner's arguments hold up to scrutiny.

The Commissioner's non-retrospective-nature argument is disingenuous.  Dr. Rashtian's letter was dated but three weeks after the ALJ's decision.  This is not a case where there is a large gap of time between the expiration of a claimant's last insured date and/or medical supervision by the physician in question and the tendering of the medical opinion at issue.  See Johnson v. Shalala, 60 F.3d 1428, 1432-33 (9th Cir. 1995)(gap of five year between expiration of last insured and time the medical opinion in question was tendered); Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984)(upholding rejection of psychiatrist who had treated claimant several years before the relevant period and had not examined claimant in several years).  Such medical opinions tendered long-after-the fact certainly would call into question their reliability in accurately assessing a claimant's functional capacity during the relevant time frame.  See Schauer v. Schweiker, 675 F.2d 55, 60 n.5 (2nd Cir. 1982)("we would think that long-after-the-fact diagnoses of psychiatric conditions would be more difficult, and hence their reliability lower, than most such diagnoses of physical ailments").

1  Here, in contrast, the opinion in question was tendered within a
2  couple of weeks of the ALJ's decision.

3       There is also a counter-intuitive aspect to the Commissioner's
4  reasoning.  Both the ALJ and the Commissioner in its pleadings
5  before this Court have articulated why Hayes' heart condition
6  improved remarkably following each of her heart surgeries.  Yet the
7  Commissioner would now have the Court to believe that, just three
8  weeks after the ALJ's decision where he set forth the reasons why
9  Hayes' condition was so much better as of the time of his decision,
10 Dr. Rashtian's more restrictive opinion should not be considered
11 "material" because it could reflect a sudden and precipitous
12 deterioration in Hayes' condition.  This defies belief.  Rather, the
13 more sensible reading is that Dr. Rashtian's opinion, tendered so
14 close in time to the ALJ's decision itself, necessarily reflected
15 Hayes' condition not only at the time the opinion was tendered but
16 also the state of her well-being for some period of time beforehand.
17 As the Ninth Circuit itself noted, "[i]t is obvious that medical
18 reports are inevitably rendered retrospectively." Smith v. Bowen,
19 849 F.2d 1222, 1225 (9th Cir. 1988).  It is not as if a doctor's
20 opinion simply reflects the claimant's condition as of the date the
21 examination actually took place, but as a matter of logic and common
22 sense also reflects the doctor's opinion of the claimant's condition
23 for at least a period of time before the examination as well.  Given
24 how close in time Dr. Rashtian's opinion was tendered to the ALJ's
25 decision – just a matter of a couple of weeks – it cannot seriously
26 be said that his opinion was not material simply because it was
27 tendered after the ALJ's decision.

28      This leads to the next point advanced by the Commissioner,

namely, that Dr. Rashtian's opinion is irrelevant as it does not provide any specific assessment of Hayes' functional capacity. This is not entirely correct. The Commissioner is right in the sense that Dr. Rashtian's opinion does not set forth, chapter and verse, any named limitations, such as the inability to lift, stoop, walk, stand or sit. However, Dr. Rashtian's opinion does contain his assessment of Hayes' cardiac function using the AHA classification system. As noted earlier, Dr. Rashtian opined that, as a result of her heart condition, Hayes faced "slight" to "moderate" limitations in her physical ability such that she would experience chest pains, shortness of breath, and generalized fatigue after performing somewhere between ordinary and less than ordinary activity. While such a functional assessment is not as specific as is normally provided by physicians in social security cases, use of the AHA classification system has been employed by courts in evaluating the functional capacity of claimant's in social security cases. See Bevans v. Barnhart, 60 Fed.Appx. 167, 169 (9th Cir. 2003)(noting that treating doctor's rating of claimant's condition as a two on the AHA classification system contradicted doctor's later assessment that claimant was "disabled").

Indeed, the Ninth Circuit has held that failing to provide a reason for discounting a physician's opinion even when that opinion is predicated entirely upon the use of the AHA classification system is improper. See Mann v. Bowen, 1989 WL 90187 *2 (9th Cir. Aug. 4, 1989)("Although we have not considered the significance of the AHA classifications, all circuit courts that have done so have found Class III impairments to be consistent with disability. Dr. Taylor's conclusion that Mann seemed to be a Class III patient

1  should have been expressly considered by the ALJ" (citing <u>Keegan v.</u>

2  <u>Heckler</u>, 744 F.2d 972, 977 (3rd Cir. 1984); <u>Jackson v. Schweiker</u>,

3  696 F.2d 630, 631-32 (8th Cir. 1983); <u>Vitek v. Finch</u>, 438 F.2d 1157

4  (4th Cir. 1971))).

5      Dr. Rashtian's rating of Hayes on the AHA classification scale

6  therefore provided some, if not a precise, indication of Hayes'

7  overall functional capacity.  The Commissioner therefore was

8  required to provide some reason for disregarding the opinion.  That

9  being said, it does seem that placement of Hayes' functional

10 capacity between such a broad range of the functional spectrum –

11 literally assigning a claimant's abilities as being between "slight"

12 and "marked" — inherently contains ambiguities for the Commissioner

13 to determine how restrictive a claimant's functional capacity.

14 Hayes herself admits as much, stating that the AHA scale "is

15 somewhat difficult to translate . . . into Social Security terms,"

16 and that there may be some "difficulty in transposing the heart

17 classifications to Social Security terms."  (Joint Stipulation at

18 10).  However, rather than eschewing altogether consideration of Dr.

19 Rashtian's opinion on account of its imprecise nature, the

20 Commissioner should have, at a minimum, re-contacted Dr. Rashtian to

21 determine more precisely how restrictive he believed Hayes' physical

22 functional capacity was using the categories normally employed in

23 social security cases, that is, what is Hayes' capacity to lift,

24 stand/walk, etc.,.  An ALJ does have a duty to further develop the

25 record when evidence in the record is ambiguous.  <u>See</u> <u>Mayes v.</u>

26 <u>Massanari</u>, 276 F.3d 453, 459-60 (9th Cir. 2001).  The Appeals

27 Council in this case did not do this.  Accordingly, the matter must

28 be remanded to the Commissioner to further develop the record with

respect to Dr. Rashtian's opinion concerning Hayes' functional

capacity and then to consider that opinion (or, if that opinion is

to be rejected, to provide specific and legitimate reasons for doing

so) in determining Hayes' RFC.

This then leaves the question of whether the ALJ erred in his

consideration of Hayes' subjective complaints of excess fatigue.  A

claimant alleging disability based on subjective complaints of

excess fatigue "must produce objective medical evidence of an

underlying impairment 'which could reasonably be expected to produce

the pain or other symptoms alleged.'"  Bunnell v. Sullivan, 947 F.2d

341, 344 (9th Cir. 1991)(en banc).  Neither party in this case

disputes that Hayes produced such objective medical evidence.  The

ALJ found that Hayes suffered from a significant heart ailment.

Such an underlying impairment could reasonably be expected to

produce the type of fatigue and chest pains from which Hayes alleges

she suffers.  This finding, however, does not end the inquiry.

Even after a claimant makes such a proffer of proof, the ALJ

retains the ability to disbelieve the claimant's testimony regarding

the severity and disabling effects of her fatigue.  Unless there is

affirmative evidence suggesting that the claimant is lying, the ALJ

may reject the claimant's testimony only if he provides specific

findings stating clear and convincing reasons for his decision.  See

Smolen v. Chater, 80 F.3d 1273, 1283-84 (9th Cir. 1996).

Here, such reasons existed for disbelieving Hayes' testimony as

to the extent of her excess fatigue.  The most notable are the

inconsistencies in statements Hayes tendered to during the

administrative hearing with other statements and evidence in the

record.  As the ALJ noted:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> The claimant exaggerates her symptoms and
> limitations, which diminish her credibility.
> The claimant alleged that she has had multiple
> 'heart attacks' in 2002 and 2003, but the record
> fails to substantiate any heart attacks after
> October 2001.  In fact, the claimant did not
> even go to an Emergency Room after some of these
> alleged 'heart attacks.'  The claimant has
> alleged multiple instances of her [pacemaker]
> unit shutting off, but these allegations are not
> substantiated [by diagnostic tests taken of the
> pacemaker during the relevant time.] The
> claimant alleged 'very bad' memory at the
> hearing, but she is independent in her
> activities of daily living, is currently working
> full time as a loan processor, and had intact
> memory on mental status examination with the
> consulative neurologist . . . not that long
> before the hearing.  The claimant also alleged
> chest pain as a continuous problem in 2001,
> 2002, and 2003, but these reports are
> inconsistent with her reports to physicians of
> record to whom she denied the symptom of chest
> pain.

(A.R. at 26).

   Nowhere does Hayes point to any countervailing evidence in the

record that rebuts the ALJ's recitation of specific instances of

inconsistencies in her hearing testimony.  Instead, Hayes points to

other portions of her testimony - such as her reported feelings of

weakness or appetite loss – that she did report to her physicians.

The ALJ's point, however, was not that all of Hayes' hearing

testimony was inconsistent with other statements and evidence in the

record.  Rather, the ALJ noted that there were a fair number of

specific instances where portions of Hayes' testimony embellished or

were inconsistent with the record.  A claimant need not be found to

have been embellishing their story all of the time before an ALJ can

be skeptical of the claimant's credibility.  A claimant's penchant

to exaggerate or embellish her symptoms in some areas certainly

provides a clear and convincing reason for an ALJ to be doubtful of

1  the claimant's report concerning other symptoms or the effects her
2  condition may have on her.  See Fair v. Bowen, 885 F.2d 597, 604 n.5
3  (9th Cir. 1989)(noting that among the factors an ALJ can employ in
4  gauging a claimant's credibility is "ordinary techniques of
5  credibility evaluation" and prior inconsistent statements from the
6  claimant).

7       There was, however, more than these inconsistent/embellished
8  statements.  Hayes was allowed to return to work by her doctors not
9  long after each of her surgeries, and the medical regimen those
10 doctors employed to treat her condition following these surgeries
11 was neither invasive nor atypical.  Such a treatment history
12 certainly would suggest that Hayes' condition was not as grave as
13 she would have had the ALJ to believe.  While it is true that each
14 of these job attempts ended after a short period of time for
15 reported "stress" induced cardiac symptoms, it is significant that
16 upon evaluation by her physicians none of these symptoms (be they
17 "heart attacks" or her pacemaker going off) could be substantiated,
18 nor did Hayes seek treatment for the stress.  This legitimately
19 calls into question whether Hayes' failed job attempts were the
20 result of her physical impairment as she suggested to the ALJ.

21      This leads to the next point.  Hayes takes the ALJ to task for
22 purportedly viewing her heart surgeries in 2001 and 2002 as
23 "conservative" treatment.  (Joint Stipulation at 4, 8).  Hayes'
24 reading of the ALJ's decision on this point, while filled with
25 hyperbole, is divorced from reality.  The ALJ did not consider
26 Hayes' heart surgeries as "conservative" treatment, rather he found
27 that Hayes' medical treatment following those surgeries was
28 conservative suggesting that the surgeries were successful and that

1  Hayes' heart condition had improved following them.  As the ALJ

2  himself noted in his written decision:

> The [ALJ] finds it reasonable that after her
> surgeries the claimant would have been
> temporarily unable to work for several
> continuous weeks or even several continuous
> months.  The written record, however, contains
> no treating source statement that the claimant
> has been unable to perform any work for at least
> 12 continuous months since her alleged onset
> date.  Instead, the claimant has been repeatedly
> cleared by her physicians to return to work in
> 2001, 2002, and 2003.  After her surgery in
> October 2001, the medical evidence does not
> substantiate the allegations of frequent
> incidents of her [pacemaker] turning off or
> 'kicking.'  The records indicate that the unit
> has functioned normally.  The claimant was
> treated rather conservatively for her heart
> until the mitral valve surgery in December 2002.
> The record does not contain any diagnostic
> studies to substantiate an ejection fraction in
> the 20-25% range, which according to Dr.
> Gheissari was the reason mitral valve surgery
> could not be performed.  The claimant
> subsequently told Dr. Mouazzen that she did not
> have the surgery sooner than December 2002
> because she was reluctant to do so and not
> because of a low ejection fraction.

17  (A.R. at 25 (emphasis added)).

18      Given the well-articulated and evidentially well-supported

19  reason the ALJ offered for disbelieving Hayes' subjective complaints

20  of excess fatigue and chest pain, her assertion of error is not

21  well-founded.

22  /

23  /

24  /

25  /

26  /

27  /

28  /

1    Accordingly, the Commissioner's decision to deny Hayes

2  disability benefits is reversed and remanded for further development

3  of the record and further consideration of Hayes' functional

4  capacity in light of Dr. Rashtian's opinion.

5    LET JUDGMENT BE ENTERED ACCORDINGLY.

6

7  Dated: _____1/19/2006_____

8

9

10                              ____Stephen G. Larson /s/_____
                                STEPHEN G. LARSON
11                              UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28